**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BRITTO CENTRAL, INC.,

     Plaintiff,

v.                                      Case No.: 1:20-cv-01092

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

     Defendants.

## COMPLAINT

Plaintiff, BRITTO CENTRAL, INC. ("BRITTO CENTRAL" or "Plaintiff"), by its undersigned counsel, hereby complains of the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive

commercial Internet stores operating under seller aliases identified in Schedule A attached hereto (collectively, the "Defendant Aliases"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet stores through which Illinois residents can purchase products bearing infringing and/or counterfeit versions of Plaintiff's products. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products that infringe Plaintiff's trademarks and/or copyrights to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## **INTRODUCTION**

3.     This action has been filed by Plaintiff to combat online trademark and copyright infringers who trade upon Plaintiff's valuable trademarks and copyrights by selling and/or offering for sale products hereinafter referred to as the "BRITTO Products."

4.     Brazilian-born and Miami-made, Romero Britto is an international artist that uses vibrant, bold and colorful patterns to reflect his optimistic view of the world around him. Self-taught at an early age, Britto painted on scraps of paper or cardboard or any medium he could find before coming into his own.

5.     Britto's work has been exhibited in galleries and museums in over 100 countries, including the Louvre. Over the years, Britto has donated time, art, and resources to more than 250 charitable organizations. He holds a seat on several boards such as Best Buddies International, and St. Jude's Children's Research Hospital, and was recently appointed to the board of HRH The Prince of Wales charity, The Prince's Trust.

6.      Britto's philanthropy is largely supported by the sales and licensing of his brand and creative works which have a unique, stand-alone style that is frequently copied by unscrupulous sellers at prices substantially below an original as shown in the example below:

ORIGINAL



COUNTERFEIT

7.      The above example of one of the Defendant Aliases on the WISH platform

evidences a cooperative counterfeiting network using fake eCommerce store fronts designed to appear to be selling authorized products. To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 1**.

8.      The Defendant Aliases share unique identifiers, such as design elements and

similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as take downs and other measures, the use of aliases enables counterfeiters to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>
> . . .
>
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
>
> . . .
>
> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

9.       eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform.  It formed a special task force that worked in conjunction with Chinese authorities for a boots-on the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to

play                    whack-a-mole                    with                    authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20                    

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

 

See Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm  (**Exhibit 2**)

10.	Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good-will as well as the quality of goods bearing the trademarks and copyrighted images. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

6

Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.

…

The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 1**) at 4, 8, 11.

11.     Not only are the creators and brand holders harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.  P3

> The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. <u>This illicit trade must be stopped in its tracks</u>.

*Id.* at 4. (Underlining in original)

12.     Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting network are at work in the instant action. For example, the online storefront names set forth in Schedule A employ no normal business nomenclature and, instead, have the appearance of being made up with no identifiable address provided. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine products, while selling inferior imitations of Plaintiff's products. It is also no coincidence that the counterfeit products at issue bear similarities in cost and design another sign of a counterfeiting network in action. The Defendants operate as a concerted network of counterfeiters operating on eCommerce sites such as Amazon, eBay, Wish and, Alibaba. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's registered trademarks and copyrights, as well as to protect unknowing consumers from purchasing unauthorized products over the Internet.

### THE PLAINTIFF

13.     Plaintiff BRITTO CENTRAL, INC. ("BRITTO CENTRAL") is a Florida corporation. BRITTO CENTRAL maintains its principal place of business at 818 Lincole Road, Miami Beach, Florida, 33139.

14.     Plaintiff is the owner of the BRITTO trademarks, which are covered by U.S. Trademark Registration Nos. 4,851,477; 4,302,879; 4,256,165; 4,225,623; 4,146,818; 4,047,741 and 3,824,466 ("BRITTO trademarks"). A true and correct copy of the federal trademark registration certificate for the marks are attached hereto as **Exhibit 3**. Plaintiff is the owner of Copyright Registration Nos. VA-1-842-771; VA-1-801-465; VA-1-801-462; VA-1-801-201; VA-

1-800-825; VA-1-800-821; VA-1-800-820; VA-1-800-819; VA-1-800-803; VA-1-800-561; VA-1-800-500; VA-1-800-497; VA-1-800-464; VA-1-800-320; VA-1-800-297; VA-1-790-046; VA-1-790-043 and VA-1-776-066 (("BRITTO copyrights") are attached hereto as **Exhibit 4**. All of the copyrights have an effective date that predates defendants acts of copyright infringement.

15.     Below is a portion of BRITTO CENTRAL's official website, offering for sale original products online:



http://www.shopbritto.com/

16.     The BRITTO trademarks and copyrights are distinctive and identify the source of the merchandise as goods sold by the Plaintiff.  The BRITTO trademark registrations constitute prima facie evidence of their validity, and of Plaintiff's exclusive right to use the BRITTO trademarks pursuant to 15 U.S.C. § 1057 (b). The BRITTO trademarks have been continuously used and never abandoned.

17.     Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the BRITTO trademarks and BRITTO

copyrights. The BRITTO registrations constitute *prima facie* evidence of its validity, and of Plaintiff's exclusive right to use the BRITTO trademarks pursuant to 15 U.S.C. § 1057 (b) and art works pursuant to 17 U.S.C. § 101. As a result, products bearing the BRITTO trademarks and derived from the BRITTO copyrights are widely recognized and exclusively associated by consumers, the public, and the trade community as being products sourced from Plaintiff.

## THE DEFENDANTS

18.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Aliases. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit and infringing BRITTO products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

19.     The success of the BRITTO products has resulted in significant counterfeiting and infringement. Plaintiff has identified numerous marketplace listings on eCommerce platforms such as, but not limited to, eBay, WISH, Aliexpress, and Alibaba, including the Defendant Aliases, which have been offering for sale, selling, and importing illegal products to consumers in this Judicial District and throughout the United States. Defendants have persisted in creating the Defendant Aliases. eCommerce sales, including eCommerce Internet stores like those of Defendants, have resulted in a sharp increase in the shipment of unauthorized products into the United States. *See* **Exhibit 5**, Department of Homeland Security, *Fiscal Year 2018 Seizure Statistics*

*Report.* According to Customs and Border Patrol's ("CBP") report, over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *Id.* Over 85% of CBP seizures originated from mainland China and Hong Kong. *Id.* Counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

20.     Counterfeiting rings are able to take advantage of the anonymity provided by the Internet which allows them to evade enforcement efforts to combat counterfeiting. For example, counterfeiters take advantage of the fact that marketplace platforms do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these Internet platforms." **Exhibit 6**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 41 Nw. J. Int'l L. & Bus. 24 (forthcoming 2020). Further, "Internet commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." *Id.* at 25. This lack of meaningful regulation allows the Defendants to garner sales from Illinois residents by setting up and operating eCommerce Internet stores that target United States consumers using one or more seller aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold counterfeit products to residents of Illinois.

21.     Shrouding their counterfeiting operation in anonymity allows the defendants to operate as a ring of counterfeiters operating on eCommerce sites such as WISH, eBay and, Alibaba. Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, the online storefront names set forth in Schedule A employ

unconventional nomenclature designed to conceal identifying information of the true owner. Instead, the seller names appear to be made up aliases with intentionally omitted ideintifying information. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of Plaintiff's products.

22.     Another telltale sign of a mutually cooperative counterfeiting ring in operation is that, on information and belief, Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling counterfeit products. Such seller alias registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

23.     On information and belief, the level of cooperation between the Defendants is so significant that they are in constant communication with each other and regularly participate in all kinds of online private chat rooms and through websites such as sellerdefense.cn regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

24.     Upon information and belief, Defendants facilitate sales by concurrently employing and benefitting from substantially similar advertising and marketing strategies as well as by designing the Defendant Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine BRITTO products. Many of the Defendant Aliases look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal.  Defendant Aliases often include images and design elements that make it very difficult for consumers to distinguish such unauthorized sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos.

Plaintiff has not licensed or authorized Defendants to use the BRITTO Trademarks and Copyrights.

25.     Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Aliases. Upon information and belief, Defendants regularly create new online marketplace accounts on various platforms using the identities listed in Schedule A of the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Alias registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive infringing operation, and to avoid being shut down.

26.     Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Aliases. For example, many of the Defendant Aliases have virtually identical layouts. In addition, many of the unauthorized BRITTO products for sale in the Defendant Aliases bear similarities and indicia of being related to one another, suggesting that the illegal products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. Such commonalities include incomplete logos, improper spelling and `other written  materials.

27.     The Defendant Aliases also include other notable common features, including lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

28.     Further, illegal operators such as Defendants typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. accounts, (collectively "PayPal"), behind layers of payment gateways so that they can continue operation in spite of any enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction

of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore operators regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

29.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using infringing and counterfeit versions of Plaintiff's products in connection with the unauthorized advertisement, distribution, offering for sale, and sale of illegal products into the United States and Illinois over the Internet. Each Defendant Alias offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has offered to sell infringing products into the United States, including Illinois.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

30.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

31.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered BRITTO trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The BRITTO trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiff's products provided under the BRITTO trademarks.

32.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the BRITTO trademarks without Plaintiff's permission.

33.     Plaintiff is the exclusive owner of the BRITTO trademarks. Plaintiff's United States Registrations for the BRITTO trademarks (**Exhibit 3**) are in full force and effect. Upon

information and belief, Defendants have knowledge of Plaintiff's rights in the BRITTO trademarks and are willfully infringing and intentionally using counterfeits of the BRITTO trademarks. Defendants' willful, intentional and unauthorized use of the BRITTO trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general consuming public.

34.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

35.     Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its well-known BRITTO trademarks.

36.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit BRITTO products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

37.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

38.     Defendants' promotion, marketing, offering for sale, and sale of infringing and counterfeit BRITTO products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' counterfeit BRITTO products by Plaintiff.

39.     By using the BRITTO trademarks in connection with the sale of counterfeit BRITTO products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit BRITTO products.

40. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit BRITTO products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

41. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILCS § 510, *et seq.*)

42. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

43. Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit BRITTO products as those of Plaintiff, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine BRITTO products, representing that their products have Plaintiff's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

44. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

45. Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## COUNT IV
## COPYRIGHT INFRINGEMENT 17 U.S.C. § 501(a)

46.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

47.     The BRITTO Works have significant value and have been produced and created at considerable expense. Plaintiff is the owner of each of the original works, which are covered by Copyright Registrations. (**Exhibit 4**)

48.     Plaintiff, at all relevant times, has been the holder of the pertinent exclusive rights infringed by Defendants, as alleged hereunder, including but not limited to the copyrighted BRITTO Works, including derivative works.

49.     Upon information and belief, Defendants had access to the works through Plaintiff's normal business activities. After accessing Plaintiff's work, Defendants wrongfully created copies of the copyrighted BRITTO Works without Plaintiff's consent and engaged in acts of widespread infringement through posting the works via online websites and digital markets, and the creation and sale of prints.

50.     BRITTO CENTRAL is informed and believes and thereon alleges that Defendants further infringed BRITTO CENTRAL's copyrights by making or causing to be made derivative works from the BRITTO Works by producing and distributing reproductions without BRITTO CENTRAL's permission.

51.     BRITTO CENTRAL's products include a copyright notice advising the general public that the BRITTO Products are protected by the Copyright Laws.

52.     Defendants, without the permission or consent of the Plaintiff, have, and continue to sell online infringing derivative works of the copyrighted BRITTO Products. Defendants have violated Plaintiff's exclusive rights of reproduction and distribution. Defendants

actions constitute an infringement of Plaintiff's exclusive rights protected under the Copyright Act (17 U.S.C. §101 et seq.).

53.     Further, as a direct result of the acts of copyright infringement, Defendants have obtained direct and indirect profits they would not otherwise have realized but for their infringement of the copyrighted BRITTO Works. BRITTO CENTRAL is entitled to disgorgement of Defendants' profits directly and indirectly attributable to their infringement of the BRITTO Works.

54.     The foregoing acts of infringement constitute a collective enterprise of shared, overlapping facts and have been willful, intentional, and in disregard of and with indifference to the rights of the Plaintiff.

55.     As a result of Defendants' infringement of Plaintiff's exclusive rights under copyrights, Plaintiff is entitled to relief pursuant to 17 U.S.C. §504.

56.     The conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyright and ordering that Defendants destroy all unauthorized copies. Defendants' copies, plates, and other embodiment of BRITTO Works from which copies can be reproduced should be impounded and forfeited to BRITTO CENTRAL as instruments of infringement, and all infringing copies created by Defendants should be impounded and forfeited to BRITTO CENTRAL, under 17 U.S.C §503.

## COUNT V
## CIVIL CONSPIRACY

57.     Plaintiff repleads and incorporates by reference each and every allegation set

forth in the preceding paragraphs as if fully set forth herein.

58.     Plaintiff is informed and believe and thereon allege that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, a concerted and collaborated effort to maintain the distribution, marketing, advertising, shipping, offering for sale, or sale of fake BRITTO Products in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

59.     The intent, purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine BRITTO CENTRAL and its business by unfairly competing against it as described above.

60.     The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant has deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

61.     As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, BRITTO CENTRAL has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which BRITTO CENTRAL has no adequate remedy at law.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)     That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

a. using the BRITTO trademarks and copyrights in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine BRITTO product, or is not authorized by Plaintiff to be sold in connection with the BRITTO trademarks and copyrights;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine BRITTO product or any other product produced by Plaintiff that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the BRITTO trademarks and copyrights;

c. committing any acts calculated to cause consumers to believe that Defendants' counterfeit BRITTO products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the BRITTO trademarks and copyrights and damaging Plaintiff's goodwill;

e. otherwise competing unfairly with Plaintiff in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any BRITTO trademarks and/or copyrights, or any reproductions, counterfeit copies, or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, or any other domain name or online

marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit BRITTO products; and

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through g, above;

3) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as Amazon and Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Domain Names, and domain name registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit BRITTO products using the BRITTO trademarks and copyrights, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing BRITTO products using the BRITTO trademarks and copyrights; and

    c. take all steps necessary to prevent links to the Defendant Online Stores identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Online Stores from any search index; and

4)      That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the BRITTO trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5)      For Judgment in favor of Plaintiffs against Defendants that they have: a) willfully infringed Plaintiffs' rights in its federally registered copyright pursuant to 17 U.S.C. §501; and b) otherwise injured the business reputation and business of Plaintiffs by Defendants' acts and conduct set forth in this Complaint;

6)      For Judgment in favor of Plaintiffs against Defendants for actual damages or statutory damages pursuant to 17 U.S.C. §504, at the election of Plaintiffs, in an amount to be determined at trial;

7)      In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the BRITTO trademarks;

8)      That Plaintiff be awarded its reasonable attorneys' fees and costs; and

9)      Award any and all other relief that this Court deems just and proper.

DATED: February 14, 2020                       Respectfully submitted,

                                               */s/ Keith A. Vogt*
                                               Keith A. Vogt (Bar No. 6207971)
                                               Keith Vogt, Ltd.
                                               111 W Jackson BLVD, Suite 1700
                                               Chicago, Illinois 60604
                                               Telephone: 312-675-6079
                                               E-mail: keith@vogtip.com

                                               **ATTORNEY FOR PLAINTIFF**